# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ALAN SIMONS, | : | |
|     Petitioner, | : | |
| | : | CIVIL ACTION |
|     v. | : | No. 19-5074 |
| | : | |
| JOHN BROWN and | : | |
| LORRAINE BROWN, | : | |
|     Respondents. | : | |

**McHUGH, J.**                                                                                                          **March 16, 2020**

## MEMORANDUM

This action follows an arbitration award ("Award") resolving a business dispute between two partners after they had a falling-out. The losing party, Alan Simons, asks this Court to vacate the Award under Section 10(a) of the Federal Arbitration Act ("FAA"), while the prevailing parties, John and Lorraine Brown,[1] cross-move to confirm it. The dispute turns on the construction of a series of contracts. After extensive discovery during the arbitration process, the Browns moved for summary judgment. The arbitrator, without any procedural objection from Simons, addressed the merits of the motion and decided the case as a matter of law based on the language of the agreements. Simons, undoubtedly recognizing the substantial deference owed to an arbitrator's decision, now seeks to vacate the award through a series of interrelated arguments—some procedural and some substantive—that focus on the arbitrator's use of summary judgment as the vehicle to decide the case. None of those arguments provide a basis for setting aside the Award, which will be confirmed.

---

[1] John and Lorraine Brown are husband and wife, and Lorraine Brown is a party to one of the agreements at issue.

**I.     Background**

   **A. The Underlying Dispute[2]**

Before 2007, Alan Simons was the sole owner of a business called RDS Vending LLC ("RDS").  Then, in January 2007, Simons entered into various agreements with John Brown and others through which Simons, among other things, sold 50% of his interest in the business to Brown.  The agreements made Simons and Brown the sole shareholders of RDS.  Two of those agreements are relevant to this dispute:  the Buy-Sell Agreement and the Put-Call Agreement (collectively referred to as the "Simons-Brown Agreements").  Each agreement contains provisions restricting Simons's and Brown's ability to part with any portion of their interest in RDS except under certain conditions.  For example, the Buy-Sell Agreement contains the following provision:

> 3. Lifetime Restrictions.  Neither of the Stockholders shall, at any time during the term of this Agreement, give, sell, assign, transfer, encumber, or otherwise dispose of all or any part of his Stock unless and until he shall (i) dispose of all of his Stock under the Put and Call, (ii) obtain the written consent of the other Stockholder or (iii) comply in full with the requirements of this Agreement.

Similarly, the Put-Call Agreement provides that "Both Simons and the Buyer [Brown] agree not to pledge, mortgage, or in any manner encumber or allow liens to be attached against the Option Interests (in the case of Simons) or Buyer's 50% Membership Interests."

Tom Hutchison, Brown's brother-in-law, was also a party to the Simons-Brown Agreements.  Simons hired Hutchison as an employee of RDS, ostensibly grooming him to manage the business after Simons either was bought out by Brown or after Simons's death.  Under the agreements, Hutchison could purchase either Brown's or Simons's half of the

---

[2] The background facts here are drawn from the final arbitration Order Granting Summary Judgment.  *See* Pet. to Vacate Arbitration Order Ex. E, at 154-58, ECF 1-3.

company in the event one of them died. He could also purchase Simons's half if Simons became disabled. The agreements required Brown and Hutchison to maintain a life insurance policy on Simons, and they required Hutchison and Lorraine Brown to maintain a policy on Brown that would fund Hutchison's purchases of Brown's interest.

Over a period lasting more than a decade, Brown and Hutchison entered into a series of side contracts with each other (the "Brown-Hutchison Agreements"), unbeknownst to Simons. In December 2006, Brown and Hutchison entered the first of these agreements—General Agreement No. 1—which was drafted without the assistance of an attorney. Under that agreement, Brown sold 4% of his interest in RDS to Hutchison at a price of $100,000. Shortly thereafter, the parties entered General Agreement No. 2, which superseded General Agreement No. 1 and gave Hutchison the right to obtain 4% of Brown's interest in the company at a cost of $100,000, but this time only upon the earlier of Brown's buyout of Simons under their agreements, or Simons's consent to the sale. This second agreement was drafted by an attorney. The specific date Brown and Hutchison entered into General Agreement No. 2 is unknown. However, the arbitrator concluded that the evidence appeared to show that General Agreement No. 2 was signed sometime after February 1, 2007.

Almost two years later, Brown and Hutchison altered the arrangement they created in General Agreement No. 2 by entering the General Agreement Modification (the "Modification"). It left in place the provisions ensuring that Hutchison could only consummate the purchase if a triggering event occurred. But it also introduced new terms. For example, it gave Hutchison the right to purchase up to 10% more of Brown's interest in RDS than he could previously. And it required Brown to pay Hutchison a portion of each profit distribution that he received from RDS.

3

In total, General Agreement No. 2 and the Modification remained in force for more than ten years.

At some point in 2017, Simons received an overture from a company called Cross Keys Capital offering to find a party to buy RDS. Cross Keys assured Simons it could facilitate sale of RDS at a price that would fetch Simons more money than he was due if Brown bought him out under the formulas in the Simons-Brown Agreements. As promised, Cross Keys found a buyer willing to pay $26 million. But the Simons-Brown Agreements required both parties to agree to any sale of the company. Although Brown authorized Simons to seek a sale of RDS through Cross Keys, he ultimately rejected the $26 million offer because he wanted any potential deal to include an extra $4 million for him to pay Hutchison.

Approximately two years after the Cross Keys deal fell through, Brown and Hutchison signed the Agreement and Mutual Release, terminating Hutchison's rights under the Modification in exchange for consideration from Brown that included a lucrative mix of benefits and distributions. Simons first learned about the side agreements between Brown and Hutchison in February 2019, and he learned about their execution of the Agreement and Mutual Release sometime thereafter.

### B. Procedural History

Brown remained a member of RDS after terminating his contractual relationships with Hutchison. *See* Pet. to Vacate Arbitration Order Ex. B ¶ 2, ECF 1-2. After discovering the Brown-Hutchison Agreements, Simons filed a Demand for Arbitration ("Demand") against the Browns with the American Arbitration Association ("AAA") in early-March 2019, seeking relief

under Pennsylvania's Declaratory Judgments Act.[3] *See* ECF 1-2 ¶¶ 44, 50.  Specifically, Simons sought a declaration that Brown materially breached the Simons-Brown Agreements by entering into side agreements with Hutchison, and a further declaration that Brown's purported breach relieved Simons of his own contractual obligations.  ECF 1-2 ¶¶ 43-54.

The AAA initially appointed a highly respected and experienced lawyer as the arbitrator, but Simons's counsel objected because of purported bias and conflict of interest.  Respt's Opp. Br. Ex. 5, at 27, ECF 5-2.  The AAA obliged Simons by appointing a new arbitrator:  Judy Weintraub, Esq., a Distinguished Neutral with the International Institute for Conflict Prevention and Resolution.  ECF 5-2, Exs. 6, 7.  Her appointment was accepted without objection.  ECF 5-2, Ex. 8.

During the arbitration process, the parties engaged in robust discovery that generated an extensive record, which included written submissions, third-party subpoena practice, expert reports, and the depositions of Brown, Simons, Hutchison, and two others.  Respt's. Opp. Br., at 8, ECF 5.  Once the record was fully developed, the Browns moved for summary judgment, which Simons opposed.  ECF 5-2, Exs. 9, 10.  Weintraub held oral argument on the summary judgment motion on October 3, 2019.  ECF 5-2, Ex. 11.  Five days later, Weintraub issued a draft of a proposed Order granting Respondent's motion for summary judgment and gave the parties until October 14, 2019 to lodge objections to her tentative ruling.  ECF 5-2, Ex. 12. Simons seized the opportunity in a 12-page "Memorandum of Errors in the Draft Order," raising multiple substantive, rather than procedural, objections to the Arbitrator's proposed findings. ECF 5-2, Ex. 13.

---

[3] The Act provides that "any person with an interest in a written contract may have a court or arbitrator, as the case may be, determine a question of construction or validity arising under the contract."  42 Pa. C.S. § 7533.

Weintraub issued her final Order three days later, granting summary judgment in favor of the Browns on the basis that Brown did not materially breach his agreements with Simons. *See* ECF 1-3. Weintraub specifically addressed the effect that each of the Brown-Hutchison side agreements had on the contractual relationship between Simons and Brown. She found that although General Agreement No. 1 constituted a breach, the subsequent Brown-Hutchison Agreements remedied that breach by making Hutchison's receipt of Brown's shares contingent on triggering events—none of which occurred—and that Hutchison's inchoate rights were ultimately extinguished by the Release. According to Weintraub, Simons was never denied the benefit of his bargain with Brown because none of Brown's interest ever transferred to Hutchison. Therefore, any breach created by their first side agreement was, in the end, not material. In reaching her conclusion, Weintraub rejected Simons's proffered extrinsic evidence as unnecessary to interpret what she concluded to be unambiguous agreements. She also considered and disposed of the objections Simons raised in his Memorandum of Errors.

After losing the arbitration, Simons instituted this action by filing a Petition to Vacate Arbitration Order, ECF 1, and Motion to Vacate Arbitration Award. ECF 2. The Browns opposed Simons's request to vacate and cross-moved for confirmation of the Award, ECF 5, and Simons replied to Brown's Opposition and Cross-Motion. ECF 8. Accordingly, this matter is now ripe for the Court's adjudication.

## II. Jurisdiction

The FAA does not independently confer federal question jurisdiction, and as a result, reviewing courts must find jurisdiction on the face of the complaint, rather than by looking through to the underlying dispute. *Goldman v. Citigroup Glob. Markets Inc.*, 834 F.3d 242, 254-55 (3d Cir. 2016). Simons's Petition invokes the Court's diversity jurisdiction and asserts that he is a citizen of Florida, while the Browns are citizens of Pennsylvania. ECF 1, at 1. In their

Opposition, the Browns challenged whether Simons really is a Florida citizen. ECF 5, at 7 n.1. For that reason, the Court directed the parties to brief the issue of whether Simons is a citizen of Florida for diversity purposes, specifically directing the parties to address the factors set forth in *Park v. Tsiavos*, 165 F. Supp. 3d 191, 199 (D.N.J. 2016), *aff'd*, 679 Fed. App'x 120 (3d Cir. 2017). ECF 9.

Although a close call, based on the briefing and proffered evidence of Simons's domicile, I am satisfied that he is domiciled in, and therefore a citizen of, Florida. Several facts offered by Simons support that conclusion: (i) Simons became a permanent resident of Florida in 2016; (ii) he has obtained the Florida Homestead Exemption, which Florida courts view as dispositive of domicile;[4] (iii) he is registered to vote in Florida; (iv) he has a Florida driver's license and vehicle registration; and (v) courts in this Circuit have found domicile in Florida on facts similar to those Simons averred here.[5] I conclude that diversity jurisdiction is proper and will address the merits of the case.

## III. Vacation of arbitration awards under the FAA

### A. Standard of Review

Section 10 of the FAA provides four specific grounds under which a federal court may vacate an arbitration award. Simons invokes two of them:

> (3) where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or

---

[4] *See, e.g.*, *Bittorf v. Lexington Ins. Co.*, 2018 WL 2976734 (M.D. Fla. May 24, 2018), *report and recommendation adopted*, 2018 WL 2970923 (M.D. Fla. June 13, 2018).

[5] *See, e.g.*, *Schiavone v. Donovan*, 2009 WL 2957315 (D.N.J. Sept. 15, 2009); *Wolgin v. Smith*, 1995 WL 434395 (E.D. Pa. July 20, 1995);

7

> (4) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite Award upon the subject matter submitted was not made.

9 U.S.C. § 10(a). In assessing Simons's claim, I am mindful that district courts "do not sit to hear claims of factual or legal error by an arbitrator as an appellate court does in reviewing decisions of lower courts." *United Paperworkers Int'l Union, AFL-CIO v. Misco, Inc.*, 484 U.S. 29, 38 (1987). Rather, they must accord strong deference to an arbitrator's findings of fact and legal conclusions "[b]ecause the parties have contracted to have disputes settled by an arbitrator chosen by them rather than by a judge." *Id*. at 37. To respect the parties' choice to arbitrate, a "court will set [the arbitrator's] decision aside only in very unusual circumstances." *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 942 (1995) (citations omitted). Otherwise, arbitration would merely be the opening act in a "more cumbersome and time-consuming judicial review process." *Oxford Health Plans LLC v. Sutter*, 569 U.S. 564 (2013).

Simons now requests the type of review *Oxford Health* cautions against. He asks me to put aside judicial deference for three reasons: first, Weintraub allegedly refused to hear extrinsic evidence necessary to interpret the various agreements; second, Weintraub purportedly exceeded her authority as an arbitrator; and third, Weintraub supposedly disregarded the summary judgment standard. Simons's first argument is based on Section 10(a)(3)'s protections from an arbitrator's misconduct "in refusing to hear evidence pertinent and material to the controversy," while the remaining two arguments rest upon Section 10(a)(4)'s prohibition on arbitrators exceeding their power. Each of the grounds upon which Simons asks me to vacate the award requires a steep climb over difficult terrain. For reasons more fully set forth below, I conclude that Simons does not come close to the summit with any of his arguments.

Ultimately, all three arguments merge into one: Weintraub knew the summary judgment standard, and even cited it, but misapplied the standard and reached an erroneous result. I

disagree because the record reveals that Weintraub reached her decision by applying, rather than rejecting or ignoring, the summary judgment standard.

### B. Simons has not demonstrated an entitlement to relief under Section 10 of the FAA

Because Simons places Weintraub's alleged refusal to hear evidence at the heart of his objections to the Award, I will first address his argument under Section 10(a)(3).

*1. Weintraub heard all material and pertinent evidence*

Section 10(a)(3) permits a court to vacate an arbitration award "where the arbitrators were guilty of misconduct . . . in refusing to hear evidence pertinent and material to the controversy." An arbitrator's error in excluding evidence can only support vacation of an award if it is "in bad faith or so gross as to amount to affirmative misconduct." *United Paperworkers*, 484 U.S. at 40. The arbitrator's error must be "not simply an error of law, but [one] which so affects the rights of a party that it may be said that he was deprived of a fair hearing." *Whitehead v. Pullman Grp., LLC*, 811 F.3d 116, 120 (3d Cir. 2016) (alteration in original) (cleaned up).[6] Additionally, a court may vacate an arbitration award because of "procedural irregularities so prejudicial that they result in 'fundamental unfairness.'" *Id.* (quoting *Teamsters Local 312 v. Matlack, Inc.*, 118 F.3d 985, 995 (3d Cir. 1997)).

At bottom, Simons argues that Weintraub's grant of Brown's summary judgment motion without considering extrinsic evidence constituted misconduct within the meaning of Section 10(a)(3). The record does not support such a conclusion. Instead, it demonstrates that Weintraub had an ample basis to find, as a matter of law, that the Brown-Hutchison Agreements

---

[6] This opinion uses (cleaned up) to indicate that extraneous, non-substantive information—such as internal quotation marks, alterations, and citations—has been omitted from quotations. *See, e.g., United States v. Steward*, 880 F.3d 983, 986 n.3 (8th Cir. 2018), *reh'g denied* (June 12, 2018); *United States v. Reyes*, 866 F.3d 316, 321 (5th Cir. 2017).

9

were unambiguous, with the result being that she did not require any extrinsic evidence to interpret them.

Weintraub's conclusion on this point is rooted in well-settled principles of contract interpretation under Pennsylvania law. When contracting parties reduce their agreement to writing, Pennsylvania courts "presume that the parties' mutual intent can be ascertained by examining the writing." *Duquesne Light Co. v. Westinghouse Elec. Corp.*, 66 F.3d 604, 613 (3d Cir. 1995). "Only where the writing is ambiguous may the factfinder examine all the relevant extrinsic evidence to determine the parties' mutual intent." *Id*. (citation omitted). Thus, courts must take the preliminary step of determining "as a matter of law which category written contract terms fall into—clear or ambiguous." *Id*. (cleaned up). A contract is not "rendered ambiguous by the mere fact that the parties do not agree on the proper construction." *Id*. at 614. Rather, as the Pennsylvania Supreme Court has cautioned, contractual ambiguity exists only when the agreement is subject to competing interpretations that are reasonable:

> A contract is ambiguous if it is reasonably susceptible of different constructions and capable of being understood in more than one sense. The "reasonably" qualifier is important: there is no ambiguity if one of the two proffered meanings is unreasonable. Furthermore, reviewing courts will not distort the meaning of the language or resort to a strained contrivance in order to find an ambiguity. Finally, while ambiguous writings are interpreted by the finder of fact, unambiguous ones are construed by the court as a matter of law.

*Trizechahn Gateway LLC v. Titus*, 976 A.2d 474, 483 (Pa. 2009) (cleaned up).

Simons contends that Weintraub "expressly recognized that two provisions in General Agreement No. 2 were in conflict" but then ignored that conflict when she construed the Agreement. ECF 2, at 21. Not so. Weintraub did not find that the two paragraphs of General Agreement No. 2 conflicted *with each other* when read naturally; rather, she found that Simons's preferred reading of one paragraph would *cause* it to conflict with the other if she adopted it. In

reaching that conclusion, Weintraub obeyed—rather than ignored—principles of Pennsylvania contract interpretation by refusing to adopt an unreasonable reading that would have distorted the plain language of the agreement. And once Weintraub found that the agreements were unambiguous, she could not proceed to examine the extrinsic evidence Simons offered to challenge their plain meaning. *See Duquesne Light*, 66 F.3d at 613.

Next, Simons argues that Weintraub acted inappropriately "by declining to consider the credibility of witnesses concerning the effect of the General Agreement Modification." ECF 2, at 30. In particular, he contends that "[t]he facts in the arbitration showed, indisputably, that the language in the General Agreement Modification evidenced that Hutchison 'owned units and vested options,'" ECF 2, at 27, thereby opening the door to extrinsic evidence to that effect. Weintraub disagreed, finding that the unambiguous language of the Modification did not support Simons's view. ECF 1-3, at 163. Just as before, Weintraub found the agreement before her to be unambiguous and construed it as a matter of law on the terms as expressed. That is precisely what the rules of contract interpretation required of her under the circumstances. As a result, Weintraub made no determinations about the credibility of Simons's proffered witnesses because she deemed their testimony irrelevant.

Simons cites *Chem-Met Co. v. Metaland Int'l, Inc*, 1998 WL 35272368, at *4 (D.D.C. Mar. 25, 1998), for the proposition that summary judgment is categorically impermissible in arbitrations conducted through the AAA, because the organization's Commercial Arbitration Rules require an evidentiary hearing on the merits of the dispute. *Chem-Met* has not been widely embraced. A panel of the Third Circuit refused to adopt *Chem-Met*, noting that the Rules offer arbitrators flexibility in conducting the proceedings. *Sherrock Bros. v. DaimlerChrysler Motors Co., LLC*, 260 Fed. App'x 497, 501-02 (3d Cir. 2008).

11

Furthermore, *Chem-Met* involved profound irregularities raising questions of procedural due process. In particular, the arbitrators never admitted documents into evidence, denied repeated requests for an evidentiary hearing, and entered summary judgment without issuing a written opinion. *Chem-Met*, 1998 WL 35272368, at *3-4. That is far different than the situation before me where the parties exchanged voluminous discovery, and Weintraub held a summary judgment hearing, circulated a draft of her opinion, and allowed the parties to submit an "assignment of errors" in response that draft—which Simons did. *See* ECF 1-3, at 154; ECF 1 ¶¶ 6-12; ECF 5, at 7-10. Weintraub also issued a final decision in writing that identified, engaged, and refuted each one of Simons's assignments of error. ECF 1-3, at 154, 159-66.

Importantly, at no time during the arbitration process did Simons challenge Weintraub's supposed exclusion of evidence on procedural grounds. Instead, he waited to raise his objections on review of the Award. The Third Circuit has held that a party waives its right to seek vacation of an award on grounds of misconduct where it had constructive knowledge of that misconduct during the proceedings and chose not to challenge it at that point. *Goldman, Sachs, & Co. v. Athena Venture Partners, L.P.*, 803 F.3d 144, 149-50 (3d Cir. 2015).[7] Weintraub's draft opinion here gave Simons *actual* knowledge that she would not consider the extrinsic evidence he offered to defeat the plain meaning of the Brown-Hutchison Agreements. As the Third Circuit has cautioned, "[a] party should not be permitted to game the system by rolling the dice on whether to raise the challenge during the proceedings or wait until it loses to seek vacatur on the

---

[7] Though *Athena Venture* dealt specifically with arbitrator bias under Section 10(a)(3), its holding and reasoning apply with equal force here. In adopting the constructive knowledge standard for waiver, the Court of Appeals concluded that "if a party could have reasonably discovered that any type of malfeasance . . . was afoot during the [arbitration], it should be precluded from challenging the subsequent award on those grounds." *Athena Venture*, 803 F.3d at 150. And that conclusion simply recognizes the more general principle of waiver running through all jurisprudence: parties have a duty to raise objections to perceived procedural irregularities during the proceedings in which they occur instead of saving them for a basis upon which to seek review.

issue." *Id*. Crediting Simons's argument here would give him the "second bite at the apple" that troubled the Court of Appeals in *Athena Venture*. *Id*.

Simons's contentions here are more analogous to those presented by the losing party in *Whitehead*. There, the losing party sought to vacate an arbitration award after the panel refused to consider his extrinsic evidence because it was barred by New York's Dead Man Statute. *Whitehead*, 811 F.3d at 118-19 (noting the losing party's contention that the panel's ruling "effectively made it impossible for him to prove his case, thereby depriving him of a fair hearing"). The Third Circuit disagreed, reasoning that the parties' agreement to arbitrate required adjudication of their dispute under New York law—which included the state's Dead Man Statute—and therefore the arbitration panel's use of the forum's evidentiary rules could not constitute actionable misconduct under Section 10(a)(3). *Id*. at 120. Analogously, the parties here chose to arbitrate their dispute under Pennsylvania law, which bars a finder of fact construing an unambiguous agreement from considering extrinsic evidence introduced to defeat the agreement's plain meaning. Like the Court of Appeals in *Whitehead*, I can find no fault in Weintraub's fidelity to the law of the forum chosen by the parties.

In sum, Simons has not demonstrated that Weintraub's exclusion of evidence was error, let alone that it deprived him of a fair hearing. And he has not established the presence of any procedural irregularities resulting in fundamental unfairness. Even if he made such a showing, Simons waived objection to any irregularities by failing to raise them during the arbitration proceedings, particularly in a case where the arbitrator provided the parties with a preview of her decision. Accordingly, I refuse to vacate the award under Section 10(a)(3).

13

### 2. *Weintraub did not exceed her powers*

Under Section 10(a)(4), a court may vacate an award only where the arbitrator has acted "outside the scope of [her] contractually delegated authority" by issuing a decision that reflects her own notions of "economic justice" instead of drawing "its essence from the contract." *Oxford Health Plans*, 569 U.S. at 569 (cleaned up). When applying Section 10(a)(4), it is not the proper role of the court to "sit as the [arbitrator] did and reexamine the evidence under the guise of determining whether the arbitrators exceeded their powers." *Mut. Fire, Marine & Inland Ins. Co. v. Norad Reinsurance Co.*, 868 F.2d 52, 56 (3d Cir. 1989). A party seeking relief therefore "bears a heavy burden" to show the award must be overturned. *Oxford Health Plans*, 569 U.S. at 569. The weight of that burden requires a party to do more than show the arbitrator "committed an error—or even a serious error." *Id*. (cleaned up). That is so because the parties "bargained for the arbitrator's construction of their agreement" and must live with "an arbitral decision even arguably construing or applying the contract" regardless of how the court views it. *Id*. (citation omitted). Thus, "the sole question for [the court] is whether the arbitrator (even arguably) interpreted the parties' contract, not whether [she] got its meaning right or wrong." *Id*.

As an initial matter, Simons presents no basis upon which to conclude that the arbitration provision of the Simons-Brown Agreements precluded Weintraub from using summary judgment to resolve their dispute. If anything, Simons's full participation in the summary judgment process without once challenging its validity belies the notion that Weintraub lacked the authority to decide the case by that method. Further supporting that point, Simons's own Demand for Arbitration framed the dispute as "simple" and involving "clear and material breach of the agreements between the parties," ECF 1-3, at 27, a characterization entirely consistent with summary adjudication.

14

Likewise, Simons cites no authority for the proposition that Pennsylvania law prohibited the use of summary judgment to resolve this dispute. Simons himself expressly invoked the provisions of Pennsylvania's Declaratory Judgments Act, 42 Pa. C.S. § 7533, under which "any person with an interest in a written contract may have a court or arbitrator, as the case may be, determine a question of construction or validity arising under the contract." ECF 1 ¶¶ 44, 50. And as the Pennsylvania Supreme Court has implicitly recognized, summary judgment is a permissible vehicle by which to resolve declaratory judgment actions. *See Mountain Village v. Bd. of Supervisors of Longswamp Tp.*, 874 A.2d 1, 5 (Pa. 2005). In short, as a matter of procedure, the arbitrator did not exceed her power by deciding the issue through summary judgment.

Nor can it be said that the result Weintraub reached substantively exceeded her powers. "The sole question" is whether Weintraub even arguably interpreted the parties' contracts, not whether she got their meaning right or wrong. *Oxford Health*, 569 U.S. at 569. The Simons-Brown Agreements mandated arbitration, and Simons availed himself of that process. It then became Weintraub's task to judge whether Simons was released from his obligations by virtue of the Brown-Hutchison side agreements. As Simons requested, Weintraub interpreted the agreements before her to determine the scope of Simons's rights and obligations under the agreements between Simons and Brown, and I lack authority to second-guess her decision because Simons did not receive the outcome he desired.

Simons relies upon *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662 (2010), to support his contention that Weintraub exceeded her authority. ECF 2, at 24. Simons misconstrues what troubled the Supreme Court there. As the Court later explained in *Oxford Health*, the arbitrators in *Stolt-Nielsen* exceeded their powers because "the panel simply imposed

its own conception of sound policy" rather than interpreting the parties' agreement. 569 U.S. at 571 (cleaned up). Here, in contrast, Weintraub construed and interpreted the contracts placed before her, focusing on their language, as the law required. Because Weintraub reached her decision using the plain language of the various agreements, under controlling principles of Pennsylvania contract law, her decision could only be challenged if she "misapprehended the parties' intent." *Id*. But as the Supreme Court has noted, Section 10(a)(4) bars such review because "[i]t permits courts to vacate an arbitral decision only when the arbitrator strayed from [her] delegated task of interpreting a contract, not when [she] performed that task poorly." *Id*. at 571-72. Thus, even if Weintraub's decision was wrong—which is far from clear on the record before me—Simons still would not be entitled to vacation of the award under Section 10(a)(4).

### 3. *Weintraub did not manifestly disregard the summary judgment standard*

Finally, Simons argues that Weintraub manifestly disregarded the law. It remains unclear whether manifest disregard of the law continues to be viable in the Third Circuit as a judicial gloss upon the standard set forth in Section 10(a)(4) for vacation of an arbitration award. As I discussed in another case:

> This ground for vacation can be traced to *Wilko v. Swan*, 346 U.S. 427, 436-37 (1953), where the Supreme Court seemed to create an additional basis for vacatur when it contrasted erroneous interpretations of the law by arbitrators—not subject to judicial review—with "manifest disregard" of the law that would ostensibly trigger Section 10 of the FAA. Circuit courts, including the Third Circuit, initially acknowledged such a judicially created extension of § 10(a)(4). Subsequent Supreme Court decisions in *Hall Street Assocs. LLC v. Mattel, Inc.*, 552 U.S. 576, 585 (2008) and *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 672 n.3 (2010) made clear that *Wilko* did not create a general expansion of vacatur authority applicable to arbitration Awards based on contract. However, the Court has not decided whether manifest disregard nonetheless survives as an independent ground for review.

16

*Prospect CCMC, LLC v. CCNA/Pennsylvania Ass'n of Staff Nurses & Allied Professionals*, 2019 WL 342713, at *5 (E.D. Pa. Jan. 28, 2019) (McHugh, J.), *aff'd sub nom*, 2020 WL 917059 (3d Cir. Feb. 26, 2020) (cleaned up). Since the Supreme Court's rulings in *Hall Street* and *Stolt-Nielsen*, circuit courts have split on the issue, and the Third Circuit has not yet taken a position. *Whitehead*, 811 F.3d at 120-21. In two prior cases, I assumed without deciding that manifest disregard of the law remains a viable basis for vacation. *See Prospect CCMC*, 2019 WL 342713, at *5; *Knabb P'Ship v. Home Income Equity, LLC*, 2017 WL 1397247, at *2 (E.D. Pa. April 19, 2017) (McHugh, J.). Because the Court of Appeals has not held to the contrary, I will again assume without deciding that manifest disregard remains a viable basis for vacation.

"The manifest disregard standard requires more than legal error" and will justify vacation of an award only where an arbitrator's decision flies in the face of "clearly established legal precedent, such as where an arbitrator appreciates the existence of a clearly governing legal principle but decides to ignore or pay no attention to it." *Whitehead*, 811 F.3d at 121 (cleaned up). "In determining an arbitrator's awareness of the law, [courts] impute only knowledge of governing law identified by the parties to the arbitration." *Duferco Int'l Steel Trading v. T. Klaveness Shipping A/S*, 333 F.3d 383, 390 (2d Cir. 2003) (citation omitted). The party seeking vacation "bears the burden of proving that the arbitrators were fully aware of the existence of a clearly defined governing legal principle, but refused to apply it, in effect, ignoring it." *Id.* at 389. Thus, the manifest disregard standard is "extremely deferential" to an arbitrator's award. *Whitehead*, 811 F.3d at 121 (cleaned up).

Applying the standard here, I conclude that Simons has not met the heavy burden required to show Weintraub manifestly disregarded the law. To start, Weintraub cited the summary judgment standard verbatim from Simons's response to Brown's motion for summary

judgment, structuring her decision so that it mirrored the unorthodox arrangement of paragraphs in Simons's brief. *Compare* ECF 1-3, at 158, *with* ECF 1, Ex. A, at 69-70. And it is clear from the substance of Weintraub's decision that she applied the summary judgment standard in the manner required by the posture of the declaratory judgment action before her: that is, she examined whether, as a matter of law, the Brown-Hutchison Agreements encumbered Brown's ownership of RDS in violation of the Simons-Brown Agreements, and found they did not. As such, the record reveals she appreciated and applied the governing standard. Simons may not argue now that Weintraub manifestly disregarded that standard simply because she reached a result with which he disagrees.

Simons cites *Neary v. Prudential Ins. Co. of America*, 63 F. Supp. 2d 208 (D. Conn. 1999) in support of his contention that Weintraub demonstrated manifest disregard of the law. The court there vacated an award where an arbitration panel granted summary judgment in an employment action, despite "overwhelming evidence" demonstrating the existence of a genuine dispute of material fact. *Id*. at 210. No such "overwhelming" evidence in favor of Simons exists here. Furthermore, employment disputes are inherently fact intensive; contract cases are not. Contract cases begin with an analysis of the agreements at issue, and if they are clear and unambiguous, they can end there as well. Indeed, as discussed above, extrinsic evidence in a contract case is more the exception than the rule.

Conceding, as he must, that Weintraub set forth the proper rule of law concerning summary judgment, Simons then appears to argue that *Neary* stands for the proposition that a *misapplication* of the law is, in itself, sufficient to constitute manifest disregard. That is fundamentally inconsistent with the manifest disregard standard, which requires more than legal error to justify vacation of an award. Other courts in the Second Circuit have recognized as

much in declining to follow *Neary*. *See, e.g.*, *Hamilton v. Sirius Satellite Radio, Inc.*, 375 F. Supp. 2d 269, 277-78 (S.D.N.Y. 2005) (observing that "the manifest disregard of the law standard is not a basis to correct errors of law, but only to vacate awards that manifestly disregard the law"). And the Second Circuit itself, like the Third Circuit, has emphasized that the deferential nature of the review process under the standard dictates that "[w]hen arbitrators explain their conclusions . . . in terms that offer even a barely colorable justification for the outcome reached, confirmation of the Award cannot be prevented by litigants who merely argue, however persuasively, for a different result." *Matter of Andros Compania Maritima, S.A. (Marc Rich & Co., A.G.)*, 579 F.2d 691, 704 (2d Cir. 1978).

Weintraub's opinion clearly offered a justification for the outcome she reached that was far more than "barely colorable." *Id*. Weintraub produced a thorough and detailed opinion that carefully considered the evidence before her and reached a reasonable conclusion. Contrary to Simons's assertions, the record demonstrates that Weintraub was "fully cognizant of [the summary judgment standard], permitted the parties to brief the issue, and then applied the [standard] in a way designed to promote fairness in the arbitral proceedings." *Whitehead*, 811 F.3d at 121. Her decision therefore does not demonstrate error, "much less one that would rise to the level of manifest disregard of the law." *Id*. I therefore refuse to vacate the Award on the basis of manifest disregard of the law.

## IV. CONCLUSION

There is certainly reason to question Brown's side agreements with Hutchison, and one can see where Simons might be understandably aggrieved that a lucrative sale of the business fell through as a result of Brown's request for a premium from the prospective purchaser to buy out his brother-in-law. But it is not my place to consider the wisdom or fairness of the arbitrator's decision.

19

For the reasons set forth above, Simons's Petition and Motion seeking vacation of the Award must be **DENIED**, and the Browns' Cross-Motion to Confirm the Award must be **GRANTED**. An appropriate order follows.

        /s/ Gerald Austin McHugh
        Gerald Austin McHugh
        United States District Judge