IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JOHN BROWN, JR. | : | |
| | : | |
| v. | : | CIVIL ACTION NO. 22-3296 |
| | : | |
| ALAN SIMONS | : | |

| | | |
|---|---|---|
| ALAN SIMONS | : | |
| | : | |
| v. | : | CIVIL ACTION NO. 19-5074 |
| | : | |
| JOHN BROWN et al. | : | |

McHUGH, J.                                                                                              February 27, 2024

**MEMORANDUM**

These consolidated actions represent the final installment of a bitter and protracted dispute between John Brown and Alan Simons over their once-shared vending machine business, RDS Vending LLC. After thousands of pages of motions, memos, and orders in two actions before this Court, a decision by the Court of Appeals, two arbitrations, a state court action, and even a physical altercation between the parties on the record, it is time to bring this matter to an end. I conclude, through clear and convincing evidence, that Simons is in contempt of this Court's order of March 7, 2023, confirming the second arbitration award in two respects: by keeping nearly $1 million that he took from RDS to pay his personal legal fees, and by keeping an additional $275,000 that he took from RDS in August 2022. At the same time, Brown is in violation of a "no litigation" clause that the parties agreed to in June 2020, that was later memorialized by an arbitration award and then confirmed by this Court. I will order Simons to repay these amounts, deny the parties' requests for sanctions or for additional briefing on damages, and order the parties to dismiss their actions before this Court and in the Pennsylvania Court of Common Pleas.

I.      **Relevant Background**

In 2007, John Brown, Jr. purchased a 50% interest in RDS Vending, LLC from Alan Simons. Brown's Compl. ¶ 10 (ECF 1, No. 22-3296). Simons continued to serve as the sole manager of RDS and retained the other 50% interest in the company. *Id.* ¶ 11. The parties also entered into a "Put-Call Agreement," under which Simons could "put" his remaining 50% share in RDS to Brown and force Brown to buy that interest, or Brown could "call" Simons' interest and force Simons to sell. *Id.* ¶ 13. The Put-Call Agreement included a formula to set a purchase price should either party invoke this option. *Id.*

### A. The Initial Arbitration and Start of Litigation

In 2019, Simons brought an arbitration action against Brown, seeking a declaration that Brown had materially breached multiple business agreements (*i.e.*, the "initial arbitration"). *Id.* ¶¶ 15-17. The arbitrator granted Brown's Motion for Summary Judgment, prompting Simons to file a Petition to Vacate the award in this Court. *Id.* ¶¶ 18-19; *see* Simons' Petition to Vacate (ECF 1, No. 19-5074). I denied Simons' petition and granted Brown's Cross-Motion to Confirm the arbitration award. (ECF 13 & 14, 19-5074). Simons then appealed my decision to the Third Circuit. (ECF 18, 19-5074). The Third Circuit affirmed, and Brown renewed a Motion for Attorney Fees and Costs. (ECF 22 & 23, 19-5074).

### B. The Second Arbitration (the "Put-Call Arbitration")

Parallel to this litigation, on the same day that I confirmed the first arbitration award in March 2020, Simons invoked his right to "put" his stake in RDS to Brown. Brown's Compl. ¶ 29 (ECF 1, 22-3296). This move obligated Brown to buy Simons' 50% interest in the company. *Id.* But because Brown and Simons could not agree on the appropriate purchase price for Simons' share, they submitted their dispute to a second round of arbitration (*i.e.*, the "put-call arbitration"). *Id.* ¶ 30. According to Brown, Simons argued to the arbitrators that the purchase price for his

2

shares in RDS had been set by a settlement agreement reached by the parties on June 4, 2020, which was recorded in an email from Simons' counsel (George Bochetto) to Brown's counsel. *Id.* ¶ 31; *see* Brown's Ex. B (ECF 1, 22-3296). Brown retorted that the June 4 agreement was tentative and conditioned on the parties reaching a consensus about the purchase price, which they failed to achieve. Brown's Compl. ¶ 33 (ECF 1, 22-3296).

On June 7, 2022, the arbitration panel issued an award favoring Simons, and found that the June 4 settlement, as memorialized in Bochetto's email, was a binding agreement. Brown's Ex. C (ECF 1, 22-3296). In so doing, the panel set the purchase price for Simons' stake in RDS at $6.5 million. *Id.* The award also stated, "The panel shall retain jurisdiction of this matter until the above transaction has been finalized." *Id.*

Because the award did not explicitly adopt every term listed in Bochetto's June 4 email, Brown's counsel re-engaged the panel for clarification. Brown's Ex. D (ECF 1, 22-3296). On June 15, 2022, the panel confirmed that all terms of the agreement set forth in the June 4 email summary were binding on the parties. Brown's Ex. E (ECF 1, 22-3296). The binding agreement contained the following terms, which, by virtue of the put-call arbitration award, are controlling here:

- "At the time of closing, 1 million +/- will remain in RDS for post closing operating expenses"[1]

- "10 days before closing, RDS will distribute to Brown and Simons [any] cash balance, less the [above $1 million] reserve"

- "No reimbursement to anyone of attorneys fees incurred"

- "All litigation ended, no further motions etc."

---

[1] "Closing" referred to a mutually agreed upon date at which Brown would assume Simons' stake of RDS. The parties eventually agreed to August 8, 2022 as the closing date. Simons' Br. at 11 (ECF 13, 22-3296).

3

- "[Simons] will work for RDS in a transition capacity for 12 months: 6 months in Philly region, 6 months by phone while in [Florida]. During FL 6 months, [Simons] will travel back to Philly as needed a couple of times."

Brown's Ex. B (ECF 1, 22-3296).

### C. Aftermath of the Put-Call Arbitration

Following the put-call arbitration award, Simons filed a Motion to Enforce Settlement in the action before me and requested that I dismiss all pending matters, including Brown's motion for attorneys' fees. (ECF 26, 19-5074). Days later, Simons withdrew this motion. (ECF 27, 19-5074). I then held a status conference with the parties (ECF 28, 19-5074), who represented that, due to the put-call arbitration award, they intended to stipulate to a dismissal of the case within one month. In August 2022, however, Brown filed a joint Petition to Confirm the Arbitration Award together with a Complaint for breach of contract, creating a new civil action between the parties at Docket No. 22-3296. Brown alleged that he paid Simons $6.5 million for Simons' stake in RDS, as set by the put-call arbitration award, but that Simons had breached several provisions of the award. Brown's Compl. ¶¶ 40, 44 (ECF 1, 22-3296). Brown further acknowledged that, under the award's "no litigation" term, he was obligated to withdraw his pending fee petition before me (ECF 23, 19-5074) and dismiss his state court action, but he refused to do so in light of Simons' alleged breach of the award. Brown's Compl. ¶¶ 41-44 (ECF 1, 22-3296).

In response to Brown's new action, Simons filed a second Motion to Enforce Settlement in the original action before me. (ECF 29, 19-5074). Without directly acknowledging Brown's new action, Simons argued that all pending matters should be dismissed with prejudice because of the "no litigation" clause. *Id.* Brown opposed that motion and requested instead that the Court consolidate the two actions. (ECF 30, 19-5074). I agreed to consolidate the cases, but I deferred any ruling on Simons' Motion to Enforce Settlement. (ECF 32, 19-5074; ECF 3, 22-3296).

Simons then filed a Motion to Dismiss Brown's breach of contract claim and requested that I remand the matter to the arbitration panel to resolve any remaining disputes. (ECF 33, 19-5074). But, for its part, the arbitration panel has communicated to the parties that it "unanimously believes it has no authority to do anything other than await the federal court's decision on the petition recently filed by Mr. Brown" in Docket No. 22-3296. Brown's Ex. A (ECF 34, 19-5074). A related case between these parties in the Philadelphia Court of Common Pleas is purportedly also awaiting resolution of this action before it proceeds. Brown's Ex. B (ECF 34, 19-5074).

Given this absurdly complicated procedural posture, I heard oral argument, and in March 2023, entered an order and memorandum intended to set a course for resolution. (ECF 36-38, 19-5074). The order: (1) confirmed the put-call arbitration award as valid and enforceable; (2) denied Brown's outstanding motion for attorneys' fees as moot, because the arbitration award precluded these fees; (3) denied Simons' motion to enforce the June 4 settlement agreement and arbitration award as moot, because confirming the arbitration award achieved the same; and (4) denied Simons' motion to dismiss Brown's breach of contract claim, but directed Brown to show cause as to why this claim should survive given the now-confirmed arbitration award. *Id.*

Brown filed a response, arguing that he should be able to continue pursuing a breach of contract claim, and Simons then filed an answer to Brown's complaint. (ECF 39 & 41, 19-5074). I deferred a decision on whether Brown could continue to pursue a breach of contract claim, conferred with the parties, and at the parties' request, entered a case management order granting time to conduct discovery before filing motions to enforce the settlement or for contempt. (ECF 42 & 43, 19-5074).

With discovery now complete, Brown moves in Docket No. 22-3296 to hold Simons in contempt of my order confirming the arbitration award. (ECF 12, 22-3296). At the same time,

5

Simons moves in Docket No. 19-5074 to enforce settlement and sanction Brown in the form of dismissing all pending actions, thereby quashing Brown's motion. (ECF 47, 19-5074).

**II.     Standard of Review**

When an arbitration award is confirmed by a court order, "and one of [the] parties violates it, the court applies the analysis as when one of its orders is defied – it can penalize the non-complying party through contempt proceedings or the issuance of injunctive relief." *Teamsters Loc. 177 v. United Parcel Serv.*, 966 F.3d 245, 252-53 (3d Cir. 2020).

"To prove civil contempt the court must find that (1) a valid court order existed, (2) the defendant had knowledge of the order, and (3) the defendant disobeyed the order." *John T. ex rel. Paul T. v. Del. Cnty. Intermediate Unit*, 318 F.3d 545, 552 (3d Cir. 2003) (citations and quotations omitted).[2] These "elements must be proven by clear and convincing evidence, and ambiguities must be resolved in favor of the party charged with contempt." *Id.* (citations and quotations omitted). "Civil contempt sanctions are designed either to compensate the injured party or to coerce the defendant into complying with the court's order." *Roe v. Operation Rescue*, 919 F.2d 857, 868 (3d Cir. 1990). "[A] contempt citation should not be granted if there is ground to doubt the wrongfulness of the defendant's conduct." *Harris v. City of Phila.*, 47 F.3d 1342, 1349 (3d Cir. 1995) (citations and quotations omitted).

---

[2] It is not disputed here that a valid court order existed, and that Simons had knowledge of the order. Simons' Br. at 31 (ECF 13, 22-3296).

**III.     Discussion**

Brown seeks to hold Simons in contempt for violating the order confirming the put-call arbitration award.[3]  Brown's Mot. to Enforce at 7 (ECF 12, 22-3296).  Implicitly, Brown also expects the Court to excuse or overlook his own failure to comply with the confirmed award given that, despite the "no litigation" clause, he has not dismissed his actions before this Court or the Pennsylvania Court of Common Pleas.  Simons, meanwhile, points to the "no litigation" clause to demand the dismissal of Brown's state and federal actions, and effectively quash Brown's contempt motion in the process.[4]  (ECF 47, 19-5074).  I start with Brown's motion to hold Simons in contempt for violating this Court's confirmation order.

**A. Brown's Contempt Motion**

Brown argues that Simons should be held in contempt because he violated the confirmed arbitration award in four ways:

(1) By refusing to return over $980,000 in legal fee reimbursements that he "caused RDS to pay him" between October 2020 and April 2022.

(2) By failing to leave $1 million at RDS for post-closing operating expenses as of August 8, 2022.

(3) By failing to make equal distributions of cash in excess of the $1 million reserve requirement.

(4) By refusing to work in transition for RDS for one year following the closing date.

---

[3] Brown also seeks summary judgment on his breach of contract claim.  He argues that Simons is in contempt of my order confirming the put-call arbitration award, *while also* in breach of the June 4 settlement agreement that the put-call arbitration award affirmed.  Brown's Resp. to Order to Show Cause at 3 (ECF 39, 19-5074).  Because I agree that Simons is in contempt of the confirmation order, Brown's breach of contract claim must be dismissed.  The June 4 settlement agreement, upheld by the second confirmed arbitration award, required the parties to end all litigation in this dispute.  If Simons is in contempt for failing to comply with the terms of the June 4 agreement, Brown can fairly pursue a contempt order, but he cannot continue litigating a breach of contract claim in violation of that same underlying agreement.  And that is true even if Brown is then deprived of some additional contractual remedy.

[4] Simons would then, presumably, voluntarily dismiss his original action.

Brown's Mot. to Enforce at 6 (ECF 12, 22-3296).

After careful review, I conclude that Simons remains in violation of the arbitration award with respect to Brown's first and third allegations: by keeping RDS funds he took to cover his legal fees, and by keeping an additional $275,000 he took from RDS despite an insufficient "cash balance." Simons is therefore in contempt of the order confirming that award.

### 1. Legal Fees

Brown first claims that Simons should be held in contempt for keeping RDS funds that he took to pay legal fees related to this dispute. *Id.* at 8. The June 4 agreement plainly stated: "No reimbursement to anyone of attorneys fees incurred." Brown's Ex. B (ECF 1, 22-3296). The arbitration award reiterated this term: "Pursuant to Item #2 of the June 4, 2020, agreement no Attorneys' Fees shall be awarded to the parties." Brown's Ex. C (ECF 1, 22-3296). I find through clear and convincing evidence, that in violation of this term, Simons took $980,947 from RDS accounts to reimburse his legal fees after the June 4 agreement. In doing so, Simons violated this term of the arbitration award confirmed by this Court, and in failing to return these funds, he is in contempt.

Simons admits that he paid himself from RDS accounts to cover his personal attorneys' fees, but he argues that this did not violate the arbitration award for two reasons. Simons' Br. at 15-19 (ECF 13, 22-3296). First, Simons claims he had a contractual right to reimbursement under the company's Operating Agreement and his own Employment Agreement. Second, Simons argues that Brown waived this provision of the confirmed arbitration award, both before and after the put-call arbitration. As to the funds Simons took *before* the put-call arbitration, Simons stresses that Brown never demanded a return of these funds in the arbitration proceedings. And as to the funds Simons took *after* the arbitration award issued, Simons suggests that Brown tactically approved of these reimbursements by refusing to comply with the arbitration award himself.

8

I am not persuaded by Simons' arguments. All contractual rights he might have had to reimburse his attorneys' fees with RDS funds were superseded by the June 4 agreement, as reiterated by the arbitration award. He relinquished any entitlement to recoup attorneys' fees from RDS. Likewise, the notion that Brown waived this provision of the award lacks any legal basis. The arbitration award contains no exception for the funds that Simons had already, improperly taken before the award issued. And after the award issued, the Court enforced this very provision against Brown when *he* tried to reimburse over $380,000 of his own attorneys' fees. (ECF 37 at 10, 19-5074) ("Brown cannot on the one hand seek to enforce the award prohibiting reimbursement of counsel fees, which he contends Simons breached, while simultaneously moving for relief inconsistent with that award."). Simons has violated the arbitration award by taking this money.

Brown's expert calculated the amount of funds that Simons took – $980,947 – based on the following checks, made payable to Simons, from RDS accounts:

| Date | Bank Account | Check Number | Amount |
|---|---|---|---|
| 8-Oct-20 | Santander Bank x0988 | 7620 | $100,000 |
| 21-Oct-20 | Santander Bank x0988 | 7621 | $100,000 |
| 20-Nov-20 | Santander Bank x0988 | 7622 | $100,000 |
| 18-Mar-21 | Citizens Bank x93136 | 32995 | $466,862 |
| 20-May-21 | Citizens Bank x93136 | 32997 | $50,000 |
| 23-Aug-21 | Citizens Bank x93136 | 34307 | $64,085 |
| 12-Apr-22 | Santander Bank x0988 | 7624 | $100,000 |
| **Total** | | | **$980,947** |

RSM Rep., Brown's Ex. 6 at 11 (ECF 12, 22-3296).

Although Brown did not attach the underlying checks or bank statements that his expert relied upon, Simons admitted at his deposition to taking at least $880,000 from RDS to reimburse his attorneys' fees. Simons Dep., Brown's Ex. 5 at 26 (ECF 12, 22-3296) ("Q: At some point after that June 4th settlement discussion, you caused RDS to reimburse [] you for a little north of

9

$880,000 in attorney fees, correct? A: Yes.).[5] In his submissions to this Court, Simons now appears to concede that he took the full $980,947 in his response to Brown's motion, while disputing Brown's accusation that he took funds from RDS beyond what he actually owed to his attorneys: "Simons has established that he owed the attorney's fees in question, and has worked to comply with Brown's quixotic attempts to dispute the issue of payment by Simons." Simons' Br. at 19 (ECF 13, 22-3296). I view Simons' admission at deposition and statements in his briefs as clear and convincing evidence that he took $980,947 from RDS in violation of the arbitration award and failed to return these funds in contempt of the confirmation order.

### 2.  $1 Million to be left at Closing

Brown next argues that Simons violated the confirmed arbitration award because he did not ensure that $1 million dollars remained "at RDS" on the closing date of August 8, 2022. Brown's Mot. to Enforce at 18 (ECF 12, 22-3296). The arbitration award states: "$1,000,000 will remain at RDS for post-closing operating expenses. Ten days before closing RDS will distribute to Brown and Simons any cash balances, less the above $1,000,000 reserve." Brown's Ex. C (ECF 1, 22-3296).[6]

The parties' expert reports and their extensive arguments concerning this provision graphically demonstrate the perils of attempting to settle a complex commercial dispute by bullet points in an email. The actual underlying agreement refers to the one million dollars "plus or minus." This reserve is specifically linked to "post-closing expenses," except those are not

---

[5] After this deposition, Brown identified an additional $100,000 payment that Simons allegedly took from RDS to reimburse attorneys' fees, bringing the total to $980,947. Brown's Mot. to Enforce at 11 n.2 (ECF 12, 22-3296).

[6] For comparison, the June 4 agreement states: "5-At time of closing, 1 million +/- will remain in RDS for post closing operating expenses[.] 6-10 days before closing, RDS will distribute to Brown and Simons cash balance, less the 1M reserve in #5, above, and after payment of approx. $975,000 bank debt[.]" Brown's Ex. B (ECF 1, 22-3296).

defined, and neither is a timeframe for how long the "post-closing" period extends. Not surprisingly, the cursory nature of the "agreement" has resulted in expert reports that fill the gap in ways that favor each party's position. For example, Simons' expert counts change in the vending machines estimated at more than $300,000; Brown's expert ignores it. Each expert employs debits and credits for both paper and electronic transactions landing on both sides of the August 8 closing date, but they employ radically different assumptions. When all the permutations are exhausted, Simons claims available funds of some $977,000, versus Brown's assessment of just $87,000. *Compare* Newman Rep., Simons' Ex. AE at 30 (ECF 13, 22-3296), *with* RSM Rep., Brown's Ex. 6 at 7 (ECF 12, 22-3296) (claiming a cash deficiency of $912,528). The extensive excerpts from the parties' depositions shed no light on what falls within "post-closing expenses" or the applicable time frame, except to suggest that there was, at best, a vague meeting of the minds. On balance, I am persuaded that Simons' expert more realistically estimated the funds available to the business at the time of closing. Although short of a million dollars, given that the underlying agreement allowed for a range plus or minus, Brown has not established that Simons is in contempt on this term.

### 3. Excess Cash Distributions

Brown claims that Simons further violated the arbitration award by paying himself $275,000 from an RDS account three days before the closing date. Brown's Mot. to Enforce at 25 (ECF 12, 22-3296). I agree. The award permitted Brown and Simons to distribute to themselves "any cash balances" above $1 million, ten days before the closing date. Brown's Ex. B & C (ECF 1, 22-3296). The term "cash balance" does not suffer from the same ambiguity as "post-closing expenses."

No one, including Simons' own expert, contends that RDS possessed anywhere near enough in its "cash balances" on or near August 8 to justify a distribution of $275,000 to both

11

Simons and Brown. *See* Newman Rep., Simons' Ex. AE at 30 (ECF 13, 22-3296). According to Simons' expert, RDS' account balances for accessible cash stood at just $289,933 on the closing date of August 8, 2022. *Id.* at 27. The change stored in RDS' vending machines, which Simons included in his calculations toward the million-dollar operating reserve, is clearly needed for operations and not properly considered as available cash. And even accepting Simons' claim that additional funds were available on August 8 – such as estimated deposits in transit from electronic payment processors – the company's "cash balances" were still far short of the $1,550,000 million that would have been mathematically necessary for Simons to pay himself $275,000, keeping in mind that Brown would be entitled to the identical amount.[7]

Simons was not entitled to take this money by any measure of accounting. Simons admits that he took $275,000 from the business three days before the closing date and did not share that money with Brown. Simons Dep., Brown's Ex. 5 at 156-57, 202, 221-22 (ECF 12, 22-3296) ("Q. True or false, Mr. Simons, you cut yourself a check for [a] $275,000 distribution on Friday, August 5th, but you didn't send a similar check to Mr. Brown, right? A. True."). As to this obligation, Simons is therefore in contempt of the order confirming the arbitration award by clear and convincing evidence.

---

[7] Simons' brief does not seriously contend that he complied with this term of the arbitration award. He attempts, post hoc, to cobble together a list of "funds" that he theoretically left to RDS, but still falls far short of the amount that would have been needed to take $275,000 from the company. For example, Simons claims that after closing, he paid a personal credit card bill for $180,000 that was compromised of company expenses, and that RDS added "$435,000 in sales" immediately following the closing date. Simons' Br. at 11-12 (ECF 13, 22-3296). Even if true, these amounts would not factor into RDS' "cash balances" on the August 8 closing date. And at any rate, the amount left at RDS would *still* total less than $1,550,000. Using aggressive assumptions, Simons proffered expert was only willing to claim that RDS had, at the very most, $977,000 on August 8. Newman Rep., Simons' Ex. AE at 30 (ECF 13, 22-3296).

### 4. Transition Work

Lastly, Brown claims that Simons violated the arbitration award by failing to work for RDS for one year in a transitional capacity after the closing date. Brown's Mot. to Enforce at 27 (ECF 12, 22-3296). I cannot definitively say that Simons violated this term of the award. The arbitration award adopted all terms of the parties' June 4, 2020 agreement, which stated in relevant part: "Alan [Simons] will work for RDS in a transition capacity for 12 months: 6 months in Philly region, 6 months by phone while in Fl. During FL 6 months, Alan [Simons] will travel back to Philly as needed a couple of times." Brown's Ex. B (ECF 1, 22-3296).

The term "in a transition capacity" is not explained and on this record not readily definable. Simons freely admits that he did not actually "work" for RDS for more than, at most, a few days. *See* Simons Dep., Brown's Ex. 5 at 232, 234 (ECF 12, 22-3296) ("Q: For how many days after August 8th did you come into the office and work, if any? A: There was no reason to . . . . I'm a 76-year-old man. I have to get up and go to work[?] No."). But he maintains that he did assist with some transitional business dealings, that he told Brown he was available as needed, and that Brown chose not to avail himself of Simons' assistance. Simons' Br. at 25-26 (ECF 13, 22-3296).

Whatever the case, there is no rational basis on which to assess Simons' compliance with this term or to place a value on it. Among other things, what were Simons' transitional duties? How many hours per week was he expected to work? What was his compensation, if any?[8] Brown's briefs – even his reply brief – provide no real substance to this obligation and his expert

---

[8] The parties further dispute whether Simons agreed to do this transition work unpaid, as Brown contends. The day after the June 4 agreement was sent via email, Brown's counsel replied to note that Simons' "12 month transitional work is without compensation." Brown's Ex. B (ECF 1, 22-3296). But it does not appear that Simons' counsel ever replied to that message acceding to such a term, and the arbitration award does not address this question. Such a sub-dispute underscores the ambiguity of this term of the agreement, and by extension, the arbitration award affirming it.

13

report does not attempt to quantify the value of such services. And given the parties' acrimonious past, it is hard to take seriously that such forced engagement would have been productive or valuable.[9] Brown has not established how and to what extent Simons violated this term of the award.

### B. Simons' Cross Motion to Enforce

Simons has responded to Brown's motion for contempt with a cross motion to enforce the "no litigation" provision of the June 4 agreement, which provides: "All litigation ended, no further motions etc." Simons' Ex. A (ECF 47, 19-5074). When Brown filed his separate breach of contract action seeking to enforce the June 4 settlement alongside his motion to confirm the put-call arbitration award, I questioned his ability to sustain such an action given the no-litigation clause in the award he sought to enforce. (ECF 37 at 10, 19-5074).

---

[9] As one illustration, a fight broke out between the parties after Simons interrupted Brown's deposition:

> BROWN: I bought half the company. That's my money.
> SIMONS: You didn't do a damn thing for the company.
> MR. O'CONNELL: Alan.
> SIMONS: You didn't do one thing.
> MR. O'CONNELL: Mr. Simons --
> BROWN: F*** you, Alan.
> SIMONS: F*** you.
> BROWN: Go f*** yourself.
> MR. MILLS: All right. All right.
> BROWN: F*** you.
> MR. MILLS: Boys, I think it's lunchtime.
> BROWN: You know, f*** you. You f***in' old piece of s***.
> MR. O'CONNELL: Please let the record [] reflect Mr. Brown is being restrained --
> SIMONS: Look at you. You look like my father.
> BROWN: F*** you, you idiot.
> MR. MILLS: It is lunchtime. It is lunchtime.
> MR. O'CONNELL: I want the record to reflect that Mr. Mills had to restrain Mr. Brown from going after a 74-year-old man.
> SIMONS: 76.

Brown Dep., Simons' Ex. M at 145-56 (ECF 13, 22-3296).

In confirming the award, I then issued an order to show cause as to how Brown could seek to invoke part of the confirmed award while ignoring the "no-litigation" provision. (ECF 38, 19-5074). His response is wholly unpersuasive. Brown argues that the put-call arbitration decided "whether or not the settlement agreement between Brown and Simons was final and binding, but [that] it did not preclude any future equitable remedies Brown might seek for future non-compliance." Brown's June 29, 2023 Letter (ECF 44, 19-5074); *accord* Brown's Resp. to Order to Show Cause at 3 (ECF 39, 19-5074); Brown's Mot. to Enforce at 29 (ECF 12, 22-3296). To support his stance, Brown relies principally on a non-precedential Third Circuit opinion. *Siegel v. Goldstein*, No. 20-3547, 2022 WL 2234952 (3d Cir. June 22, 2022). Putting to one side that such a case carries no weight, *see Allegheny Cnty. Employees' Ret. Sys. v. Energy Transfer LP*, 532 F. Supp. 3d 189, 236 (E.D. Pa. 2021) (McHugh, J.), the panel's opinion does not support Brown's position. There, the district court's order confirming an arbitration award did not preclude a breach of contract claim because the underlying agreement expressly withheld contract claims from the arbitration. *Id.* at *5. Here, to the contrary, the underlying agreement explicitly requires an end to all related litigation, so the put-call arbitration award bars Brown's parallel breach of contract claim.

In my case management order of May 23, 2023, I cautioned the parties that only after addressing the enforceability of the award would I deal with "any remaining issues." (ECF 43, 19-5074). Counsel for Brown submitted a letter seeking assurance that he could maintain a contract action (ECF 44, 19-5074), and counsel for Simons responded with two letters of his own. (ECF 44 & 45, 19-5074). Seeing no need to explain my memorandum of March 7, 2023 to either side, I awaited further submissions from the parties in accordance with the supplemental case management order.

15

Brown is entitled to enforcement of the confirmed arbitration award to the extent that Simons has breached it, relief which will be accomplished by the order accompanying this memorandum. But there is no logical or conceptually sound basis on which he can enforce the parts of the award he likes and ignore the parts he does not by carving out an exception to the requirement that all litigation is ended. Simons couches his motion as one for sanctions, but the parties were previously advised that in the face of *two* confirmed arbitration awards, the Court would proceed through the exercise of its contempt powers. In refusing to dismiss his state court action and pursuing ancillary claims here, Brown stands in contempt of my order confirming the award that found a settlement barring further litigation. I will therefore enforce the no-litigation provision against Brown.

### C. Remedy

Brown has proven, through clear and convincing evidence, that Simons is in contempt of this Court's order confirming the put-call arbitration award by wrongfully paying himself, and then refusing to return, a total of $1,255,947 from RDS accounts, consisting of $980,947 to reimburse his attorneys' fees and his improper distribution of $275,000 three days before the closing date. I will order Simons to repay this amount to RDS within 30 days, and per diem sanctions for contempt will become operative on the 31st day. Brown's claims in these actions that go beyond enforcement of the award will be dismissed, and Brown must dismiss his action in the Pennsylvania Court of Common Pleas, with per diem sanctions for contempt to become operative 31 days from this date. And because the underlying agreement ending "all litigation" included the specific term "no further motions etc.," both parties will also be enjoined from filing motions or amended pleadings in either action before me without leave to do so. Upon notification that repayment has been made and the state court action dismissed, I will then dismiss both actions.

## IV. Conclusion

More than four years have elapsed since the initial arbitration award in the underlying dispute. Since then, these two litigants have expended substantial judicial resources in "scorched-earth litigation" serving only their private economic interests. Simons' Mot. to Enforce at 2 (ECF 47, 19-5074). It is well past time for this case to conclude. Consistent with the reasoning set forth above, Brown's Motion to Enforce the Arbitration Award (ECF 12, 22-3296) and Simons' Motion to Enforce Settlement and for Sanctions (ECF 47, 19-5074) will be granted in part and denied in part. An appropriate order follows.

/s/ Gerald Austin McHugh<br>
United States District Judge